We are now going to hear Alliance of Health Care Sharing Ministries v. Conway, No. 25-1035. And we will start with Mr. Murray. Good morning, Your Honor, and may it please the Court, Michael Murray for the Alliance. With the Court's permission, I'd like to reserve five minutes of my time for rebuttal, if possible. We'll see how it goes. Thank you. This case is about whether Colorado can single out religious groups for burdensome treatment, including subjecting their internal operations, their associates, and their speech to state review. Colorado started with legislative activity targeting quote-unquote ministries and ended up with a law regarding quote arrangements. Then Colorado enacted and implemented the law with exceptions for secular groups, including comparable groups such as direct primary care and Masonic fraternal organizations. As a result, the ministries are subject to differential treatment and burdens. The First Amendment forbids this regime and it should be enjoined. The first claim- Counsel, I thank you for that introduction, which was well stated. You've got lots of I think we're going to have lots of questions. So if you don't mind, maybe I'll get started, and I'm sure the others will jump in as well. I just wanted to start on your free exercise claim and wanted to ask you on the element of general applicability of the law. I wanted to ask you about the argument you're making about exemptions. And first of all, the reference in the Supreme Court's Fulton case to a mechanism for individualized exemptions. How have you shown that rulemaking under the statute? And I think the Colorado Administrative Procedures Act would apply as well. How would that be a mechanism for individualized exemptions? What's your argument on that? Your Honor, we don't read Fulton to require individualized exemptions. The language of categorical exemptions goes all the way back to the Lacumi itself, which actually talks about how select statutes and laws in general are selective. And there's problems when categories are exempted. And we think that principle carries through Fulton. So I, of course, agree with Your Honor that Fulton uses the language of individualized exemptions, which was in present in that case involving Philadelphia itself. But I think then Judge Alito's opinion in fraternal order is very instructive here. He actually pointed out that the language from Lacumi carried through Fulton makes it the case that it is worse when there are categorical exemptions. That case involved a beard policy from the police in New Jersey, and they had a categorical exemption for medical reasons, but wouldn't look at any religious reasons. And what Justice then Judge Alito said was that actually makes it worse. The same issue is at play, namely that the state is admitting that its policy can have departures. It can be not universally applied. It's just a different mechanism for how that is actually happening. One is individualized, one is categorical. And I think the opinion from this court in Doe's 1 v. 11 is actually instructive in that regard. It's a little bit of a different context. It was a vaccine case involving the pandemic. But in that case, what the state was doing was distinguishing around categories of religions, but it was doing it on an individualized basis because in the law, there's always a tension between rulemaking and administrative adjudication. And so I think both the Fraternal Order of Police case from the Third Circuit and this court's precedent in Doe's 1 v. 11 is instructive as to how there is not simply an exemption from Fulton any time that there's a rulemaking power for a state or local official. And here, of course, we have evidence in the case that the state has, in fact, used and implemented exceptions. We have the exemption in the statute for direct primary care, of course, which is clearly covered by the text of the statute. But we also have the state's exercise of exemptions for both certain consumer payment plans and certain types of crowdfunding. And so we see a regime where not only are there exemptions and a power to exempt, but that that is exercised. And the result is a severely gerrymandered situation where upwards of 85% of the entities and individuals that are subject to the regime are religious. And so we can see how that actually worked in practice. How was it exercised, for example, relative to crowdsourcing? What action did the state take on that front? The commissioner has rulemaking authority and promulgated a regulation exempting certain types of crowdfunding from the statute. Okay. So the commissioner has included that in a rule? Yes, Your Honor. It's in the rule that that is exempted from coverage. And so the crowdfunding arrangements clearly meet the statutory definition of facilitating payment for healthcare expenses, as do actually a whole host of organizations. And we can turn to that in a moment if we like. But what the commissioner did was he said, well, that broad language is not going to apply to certain types of crowdfunding arrangement. It does apply to other types of crowdfunding arrangements in full disclosure. So he drew a line, the commissioner did in an actual rulemaking. Do you need to make some kind of showing? If the commissioner did that on the grounds that some of these other arrangements, if you will, do not pose the level of consumer risk, maybe that in the commissioner's judgment, the sharing plans do, why isn't that an answer to your argument? Or is that something that you need to show to get a preliminary injunction? No. Oh, I'm sorry, Your Honor. Well, for example, do entities like that or fraternal benefits societies pose that they truly are similarly situated, that they're comparable, and one of the comparability elements is risk to consumers. So I think that takes us into a separate part of the general applicability analysis, the comparability analysis. I agree. The interest doesn't really affect the exemption issue. Fulton itself actually, I think, perhaps for an agreement, said that even if no exemption had been exercised, it would still be a problem under Fulton's analysis. But I'm happy to turn to the comparability question if that's where you're on. Yeah, that's where I was going. Great. So comparability is assessed based on the state's interest. And that's what Lukumi and Tandon signify. And here the state, though it has jumped around a little bit, I think the state pretty clearly states its interest on 29 of its response brief. The interest, and very succinctly, it's a big record, but I think they do it well there. And they said the interest is in consumer confusion over payment arrangements that are adjacent to traditional insurance, regulated insurance. And that's what they say their interest is. And so then the question is, how does what's going on here and the comparable activities relate to that interest? And I think Tandon and Lukumi are very instructive there. So in Lukumi, one of the interests that the state asserted was public health. And they said, well, public health is more triggered by animal sacrifice than it is by improper garbage disposal by restaurants. The Supreme Court said, no, both of them are actually triggered by public health. Both of those could be a problem for public health. And so that's the sort of way that the Supreme Court analyzed the question at that level of generality, that level of evidence. And the same was true in Tandon as well. In Tandon, the state said, well, what we're concerned about is at-home religious services, worship services. And the Supreme Court said, well, there's all sorts of things that have triggered the same COVID issues. And those range from indoor restaurants to movie theaters, to hair salons, to retail facilities. All of them trigger the same interest. And it was actually the dissent in Tandon that tried to analyze the precise level of harm, the precise quantification of what is actually a little bit more harmful or even a lot more harmful. That's what the dissent in Tandon tried to do. But the Supreme Court didn't do that analysis and neither did the majority in Lukumi 30 years ago. They looked at the type of interest and whether the same interest was triggered. The best evidence that the same interest is triggered here is actually that the statutory language, the way the state was trying to capture its interest, covers all of these arrangements. And they have to be in fact exempted. So direct primary care had to be exempted by statute. Crowdfunding arrangements had to be exempted by statute. Masonic fraternal organizations are exempted by a different statute, but it's still the same concept. And it's worth pausing on the Masonic fraternal organizations just for a moment. Colorado's law actually distinguishes between Masonic fraternal organizations, which are exempt from regulation, and other fraternal organizations, such as religious fraternal organizations, which are in fact covered by the insurance code. So this is not the first time that Colorado has tried to draw this sort of line in this area. And Masonic fraternal organizations, of course, actually provide insurance, which is clearly what the state is concerned about, unregulated insurance. And so I think that's how the comparability analysis works under Tandon and McCoomey. Now, what the state will say, I'm sure, my talented colleague on the other side will say is, well, look at the structure of these organizations. They're all different structures. And they don't share the same features. And I'll say two things about that, Your Honor. The first is, this is a little bit of an ex post situation. Those structures are not listed in the law. But many of those structures also do exist in direct primary care, which has monthly fees and access to care that's promised. And the same, of course, is true of Masonic fraternal organizations, which actually provide insurance. And so those structures that they've enumerated in their briefing to the district court and this court are actually present in the healthcare sharing ministries and in the things that are exempted. And so what I do think is important to take a step back, the question is not the precise level of harm, the precise level of risk, but rather the type of interest that is triggered by the statute. And here, that's the same interest that is triggered by both. I see that I'm eating into my rebuttal time. I'm happy to keep going or reserve the time for rebuttal with the court's permission. Other questions? All right. We'll hold off until rebuttal. Good morning. Good morning. May it please the court. Reed Morgan for the appellee, Commissioner Conway. This case is not about regulating religion. It is about protecting Colorado's consumers. Healthcare sharing plans are healthcare arrangements that resemble insurance, but lack its guarantees. The law protects consumers by shedding light into sharing plans, religious and secular alike. Prior to the law, Colorado had virtually no insight into sharing plan operations, despite evidence that they conflated their products with health insurance, while still others engaged in financial misconduct that resulted in widespread denials of reimbursement. Because of the law, we know that roughly 60,000 Coloradans are members of sharing plans. The district court correctly denied the plenary injunction and this court should affirm. I'd like to address why the alliance is unlikely to succeed on the merits of its claims, and I'll start with the free exercise claim. The law's text and legislative history show that it was enacted to address documented consumer confusion and harm. Its legislative sponsor called it a data reporting bill meant to promote transparency, but she also recognized that sharing plans work for people, including for those who hold religious beliefs associated with sharing health expenses. And the record confirms the consumer protection concerns that prompted the law. Many Coloradans enrolled in sharing plans believing they had insurance, only to learn, often after a denied claim, that they did not. And that confusion is understandable. Sharing plans have a similar collection of features to insurance plans. They use insurance terms like comprehensive coverage, deductible, and premiums, and sharing plans are sold by insurance brokers. The record also shows serious misconduct by some sharing plans. Some plans diverted as much as 90% of member contributions to affiliates, leaving little to pay claims. And these concerns were documented by both consumers and health care providers, including Children's Hospital, and are included in the record before the district court. Religious organizations, including a religious sharing plan, testified in support of the law, recognizing that it would help protect Coloradans who sought to join in sharing plans, including in furtherance of their religious beliefs. The alliance, in fact, the appellate here, testified in support of a competing version, which had similar reporting requirements, but the reporting was made to the insurance under the version of the law that was ultimately enacted. This legislative history reflects a broad agreement on the law's neutral, consumer-protective purpose. So, can you address the exemptions? Yes, I'd be happy to, Your Honor. With regard to the exemptions, the statute that was enacted by the district court is titled Health Care Sharing Plans or Arrangements. By the text of the statute, as well as what's clear from the legislative history as well, it applies to all sharing plans. It does not apply to other health care arrangements. Now, the statute also empowered the commission. Let me stop you for a minute. So, is it your position that the crowdfunding, the arrangements, aren't even covered by the statute? That's correct, Your Honor. And again, why is there an exemption for them? Your Honor, the statute, like I said, it applies specifically by its title to health care sharing plans. And then the statute authorizes the commissioner to identify by rule other consumer payment arrangements that are not subject to the statute. And so, I think the reason for that provision is to clarify for, you know, to the extent that the district court is able to do so, the commissioner can promulgate rules that clarify other entities that are not sharing plans and are therefore not subject to the reporting requirements. To be clear, your position is that you haven't exempted anyone. You have just clarified that these certain groups are not covered by the statute. That's correct, Your Honor. And again, I would just point to the statutory section title, which makes clear which entities are covered by it, as well as the legislative history, which, you know, exclusively referred to sharing plans. There was no discussion that this reporting requirement would apply to all of the other alternative arrangements that the Alliance has invoked here. However, you know, if the court were to disagree with that finding and find that the commissioner does have some exemptive authority, you know, we would also take the position, which is what the district court ruled, that the exemptive authority that is provided to the commissioner here is not the kind of individualized, case-by-case, ad hoc decision-making that was discussed in Fulton. This is, as your Honor, you know, raised, I think with opposing counsel, this is a categorical style of rulemaking. And in this court, in Axe and Flynn, confirmed that, you know, the Fulton concern about individualized exemptions is focused on systems of ad hoc decision-making. That's very different from exemptions that would be promulgated by rule. Mr. Morgan, could you respond directly to Mr. Murray's argument that they really aren't relying on the language from Fulton about individualized exemptions, that there's case law that also makes the authority to grant, by rule, categorical exemptions as problematic under a free exercise analysis because it would make the law not generally applicable? So I'm interested in your giving a direct response to Mr. Murray's argument. Your Honor, I think Axe and Flynn explicitly rejects that contention. And in doing so, it actually cites, and I think if you read Lukumi, you know, I disagree with opposing counsel interpretation of Lukumi. The court in Lukumi conducts a general applicability analysis whereby it determines whether the ordinance at issue there was treating comparable secular conduct more favorably than religious conduct. And it does consider whether there are categories of secular conduct that's being treated more favorably. But I think that's separate from the Fulton individualized exemption analysis that raises concerns that some government official could, on a case-by-case basis, potentially, you know, exempt favored secular entities. And so I think the portion of Lukumi that opposing counsel was referencing is really focused more on this question of does the law treat comparable secular conduct more favorably than religious conduct? Well, let's pick up on that then because in the briefing, there's some back and forth over whether you want to call exempted, excluded, or not covered entities are comparable to the sharing plans. And we need to remember we're at the preliminary injunction. Has Alliance made an adequate showing for preliminary injunction? What burden does Alliance have in terms of making that showing on this particular issue to meet its preliminary injunction burden? What's your position on that? Your Honor, our position is that under Kennedy v. Bremerton, and this is also confirmed I think in the Tandon opinion, it is the Alliance's burden to demonstrate that a law is not generally applicable or is not neutral. Excuse me. And in order to demonstrate that, it is the Alliance's burden to identify comparable secular activities that implicate the risks that are being regulated by the government. Because general applicability is concerned, and we know this from Tandon, with the government's asserted interests and the risks that different activities pose to that interest. Well, are you saying that they have to present, they needed to present to the district court evidence of risk or at least an argument about risk that, for example, the risk of consumer confusion relative to crowdsourcing is similar to the risk of confusion from these sharing plans. Did they have to make that showing before the district court? I think they did. And I think in some cases that showing is going to be a common sense showing. So I think in Tandon, sorry, I think in Tandon where the government's asserted interest was COVID spread. And the question was, if you have multiple households gathering together, there is this risk of COVID spread. And I think in Tandon, the court could see that in-home religious exercise would gather multiple families together and implicate that risk in the same manner that a hair salon would. But there are other cases, and I think this is one of them, where it's not as obvious that that risk presents, that different activities present the same risk. And here, we have provided over 500 pages of documented consumer confusion and harm, more than 20 consumer complaints, multiple complaints from providers, regulatory actions taken by other states, litigation, bankruptcy filings, documenting that members are not receiving reimbursement. And so we've provided- Let me ask you about this fraternal benefit society. I've been kind of grappling with that. As I understand it, there's actually a part of the insurance code that addresses fraternal benefit societies. And it says in part that they may provide the following contractual benefits, hospital, medical, or nursing benefits. And they're also subject, I take it, to insurance regulation, apart from the reporting law here. But as Mr. Murray pointed out, not all of them are. And so aren't there some fraternal benefit societies? He mentioned the Masonic ones. Why don't they come under the reporting law if they're providing what amounts to be a sharing plan? Your Honor, there's no evidence before the district court or in the record here that fraternal organizations present the same consumer confusion and harms associated with sharing plans that's addressed by the law. For example, if a person is a member of a fraternal organization and obtains some sort of insurance benefit from them, we think it's not- First of all, there's no evidence that fraternal organizations in Colorado even offer health benefit plans. Well, okay. Let me just put it this way. Let's say you did have a fraternal benefit organization, maybe it's a Masonic one, and it actually does do the same thing that the sharing plans do here, that you become a member and they facilitate coverage of health care costs. Would the law apply to them at that point? In other words, are they actually excluded? It seems the law is pretty general. Why wouldn't the reporting law apply to them in that situation? Your Honor, the reporting law, as I understand it, would not apply to them because, again, looking at the statutory title, it is addressed specifically to health care sharing plans and arrangements. I think there's good reason for that, given- But what if they're actually running a health care sharing plan? Well- If they're functionally doing that, just because they're a fraternal benefit society, that's just a label. If what they're really doing out there is the same thing, would they be subject to regulation? I think if there were a fraternal benefit organization that was indeed running a sharing plan under the definition of the statute, that might be covered by the regulation. I'm not aware that there's any evidence in the record that any organization does that. I understand. It's hard for me to, I guess, answer that specifically, but I think it would depend on the structure of what they are offering and whether it fits the sharing plan features that are defined in that statute. It sounds to me like you are making the argument, though, that we have to look at the level that we can distinguish here and that you can distinguish based on the level of risk and not just the type of risk. Your Honor, respectfully, that's not what I'm trying to characterize. I'm trying to say that sharing plans present a different type of risk. Okay, so you're saying you don't want that it's unfair to draw the distinction on just a general type of risk, consumer confusion and protection. You would say, well, that's not defined enough. That is correct, Your Honor. I think that this law was responding to a more specific risk identified arising specifically from sharing plans. How would you identify the risk? Your Honor, the risk here is that sharing plans, because they share these key features with insurance, and because they are marketed using insurance terms by insurance brokers, they are commonly viewed by Coloradans as providing the same benefits as insurance. When, in fact, there are important differences in what they provide, and that fundamental misunderstanding leads to consumer harm that flows from that. Okay, so that is a very detailed type of harm. You want to define the type of harm at a very detailed level. Well, I was trying to articulate it there specifically, but I think it could be drawn to the general level of consumer confusion and harm associated with insurance plans versus alternative health arrangements. And I see that I'm out of time, so if the panel has no further questions, I'd like to just briefly conclude. Briefly conclude. Thank you. Colorado's law doesn't target religion or speech. It was enacted in response to documented instances of consumer confusion and harm arising from sharing plans, secular and religious. The reporting requirements are factual and directly tied to Colorado's compelling interest in protecting its citizens from that confusion and harm. The Constitution permits that, and we respectfully ask that this Court affirm the District Court's denial of a preliminary injunction. Thank you. Thank you. Mr. Murray, you have some rebuttal time. Thank you, Your Honor. I'd like to make several points in rebuttal. The first concerns the exemption issue that was discussed. I think it's pretty clear here that this statute provides exemption authority. The District Court rejected the argument that it did not. The definition in the statute of facilitating payment of health care expenses is broad. And then, of course, perhaps most importantly, the Commissioner did, in fact, exercise exemption authority. Otherwise, he would not need to do so. There also is in the legislative history— Mr. Murray, how would you respond to Mr. Morgan's argument that what the Commissioner was really doing was just clarifying coverage of the statute? It's not really an exemption if the entity wasn't covered by the statute in the first instance. I think it's hard to square that argument with the broad statutory language that this covers entities or organizations. One person's exemption is another person's exclusion. Is that kind of what we're dealing with now? That may be what we're talking about. So it might be a splitting hairs question, Your Honor, or a language question. But I think it's pretty clear that in this particular situation, the statute says this section does not apply to consumer payment arrangements identified by the Commissioner by rule. And the Commissioner himself seemed to be identifying by rule things that were not covered by the broad language of the statute, which is payment arrangements that facilitate or exchange health care expenses. And in the legislative history itself—and this is where Mr. Morgan and I do have a disagreement— there is reference to giving the Commissioner this actual authority so that he can then exempt, quote-unquote, the good guys, as opposed to they wouldn't be covered by the statute. And so I do think even in the legislative history, there's some indication that this is an exemptive authority. Hey, can I just ask, I think you've split the exemption argument into two parts. Tell me if I'm wrong. But one part is just what exactly is the authority given to the Commissioner on the one hand? And then on the other hand, it's the arguments about how there are entities that are comparable and yet they are, in effect, exempted. This is the comparability. And on that score, of the eight entities that the parties are briefing, which one is the most closely comparable, in your view, to the sharing plans? The most comparable is the direct primary care arrangements, which are exempted by statute. They're clearly covered by the statutory language. Otherwise, the legislature wouldn't have felt the need to make clear that they were not covered. They also involve monthly payments, unlimited access to health care, and that's a quote in the record from the direct primary care coalition's website, and a third party, either it's employers or another third party. So they're directly comparable. I think the second most, and I'll give you two, I think you might have only asked for one, but I'll give you two. The second most is Masonic Fraternal Organizations, which actually do provide unregulated insurance. So it's not entirely clear to me at all how those could be distinguished from what is covered by the statute. I think those are the two best, but we, of course, have discussed others in the briefing. I see that my time has expired. With the court's permission, I would love to take a minute to just wrap up. Why don't you do that? Thank you, Your Honor. So in conclusion, affirming the district court's decision here is contrary to Supreme Court precedent in Fulton and McCoomey, Masterpiece Cake Shop, and others, and other circuits' case law. The ruling rests on a novel reading of Fulton that's inconsistent with Judge Alito's opinion and Fulton itself and McCoomey, and it also requires adopting the dissent's position in tandem v. Newsom, as well as some other case law that we've cited in the brief. This case is all about targeting and singling out the ministries that's not permitted by the First Amendment. That's why we sought a preliminary injunction, an injunction-pending appeal, because there's ongoing irreparable harm from this law, and we're happy to renew that if the panel, the court is interested. But in sum, we ask this court to reverse the denial of the preliminary injunction. Thank you. All right. Any further questions from the panel? All right. Well, thank you for the argument. We didn't even get to establishment clause, freedom of association, free speech. I mean, this case covers more than a semester course on the First Amendment, but I do appreciate the arguments this morning, at least speaking for myself, hopefully for the panel. I thought you were both quite helpful to us, and we will consider the case submitted, and counsel are excused.